UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MICHAEL BEHAYLO, | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO.: 05-30178-MAP |
| | ) | |
| THE TOP-FLITE GOLF COMPANY, | ) | |
| Defendant | ) | |

**PLAINTIFF'S STATEMENT OF DISPUTED FACTS**

1.  In September of 2003, Callaway Golf Company purchased certain assets of the former Spalding Sports Worldwide. (Exh. 1)

2.  In doing so, Callaway formed the Top Flite Golf Company, meant to be a stand alone entity that would manufacture and sell golf balls and golf equipment under the Top Flite and Ben Hogan names, as had Spalding. (Exh. 1)

3.  Prior to this, Spalding had been in bankruptcy, (Exh. 1) largely related to the failure of its management after it had been purchased in 1996 by KKR. (Exh. 1)

4.  In additional to a different sales and marketing approach, KKR had saddled Spalding/Top Flite with a debt of over $850,000,000. (Exh. 1).

5.  This meant that even when the company was operationally profitable, it continued to lose money (Exh. 1)

6.  Prior to this, Spalding/Top Flite had been averaging $55-$60 million dollars a year in profit. (Exh. 1)

7.  Callaway took over a new company which had already separated itself from Spalding products and which had already had layoffs and numerous transfers of employees who had worked on Spalding goods. (Exh. 1)

8.  When Callaway took over, Robert Penicka, who is in his early forties, had become the President and CEO of the Top Flite Golf Company. (Exh. 2, pp. 7-10)

9.  The intention was to operate Top Flite Golf Company as a stand alone entity. (Exh. 1)

10. Penicka hired and put in place a new management team which inclued Andrew Kelleher, Jamie Bosworth and Thomas Fry, all in their thirties. (Exh. 2)

11. Defendant's essentially assume that there is only one statement or piece of evidence reflecting age bias on the part of the new Callaway management team, that being Mr. Penicka's statement at the Chicopee Chamber of Commerce. This is not true. The evidence will show that Callaway brought with it a deep and abiding age prejudice that was reflected in numerous comments and actions of the new management team. This attitude of age bias came from the top (Mr. Penicka), and affected every decision maker in this case: Mr. Bosworth, Mr. Kelliher, Mr. Fry and Mr. Levandowski.

The nature of Mr. Penicka's statements at the Chicopee Chamber of Commerce are not substantially disputed.

What Mr. Penicka stated in his speech was:

"...if you all look up at the head table, you'll notice a lot of young faces up here and that's not by accident, that's by design, and in some cases, the people that are in the jobs they're in may not even be qualified to be in them yet". (Exh. 3, p. 192)

12. Mr. Penickas' attitude permeated the Company. In the spring of 2004, he hired Jamie Bosworth to be the National Sales Director. Mr. Bosworth quickly held a meeting with his regional sales force. He began the meeting by asking the regional managers how many sales people they would get rid of. Bosworth stated that the people who had been there over 20 years were "bleeding the company dry". (Exh. 5)

13. He referred to the "old regime" in speaking of existing employees and called them "deadwood". (Exh. 5)

14. In response to Mr. Bosworths' request, one of the regional managers complained that he had a number of older sales people and that if he had to let them go, there would be issues of age discrimination. (Exh. 5)

15. Mr. Bosworth cynically suggested that he could escape this problem by also laying off some young people to make it look good ("just fire a couple of young guys with the old guys and no one will notice"). (Exh. 5)

16. At that meeting, one regional manager, a new hire (by Mr. Bosworth), Mr. Conley (age 34), said he could let go 9-11 of his sales force of 15. (Exh. 5, Exh. 4, p. 51) Mr. Conley had not yet even met these men (Exh. 5).

17. David Richardson said that he could only let go one individual (who happened to be in his late twenties). (Exh. 5)

18. Four weeks later, Mr. Richarsdon was terminated (Exh. 5). Mr. Bosworth testified that it was Dave Richardson who had asked the question at the regional meeting about age discrimination (Exh. 4, p. 33)

19. Bosworth said he terminated Mr. Richardson because he had a "bad attitude". (Exh. 4, p. 48).

20. During that time, period, Mr. Richardson and Richard Gielow were the top performing regional managers that the Company had. (Exh. 5, 6)

20. Mr. Bosworth terminated both of them. In Mr. Richardson's case, he was told that his job was being eliminated to make way for the hiring of Reid Gorman, age 34, a friend of Mr. Bosworth's (Exh. 5).

21. In Mr. Gielow's case, Mr. Bosworth said Mr. Gielow was let go because he was "incompetent" (Exh. 4, p. 48)

22. But Mr. Gielow was told that his position was being "consolidated" (Exh. 6). In fact, he was immediately replaced by an individual named Chris Reh (age 35), who had no management experience, and who now *works for* Mr. Gielow (Exh. 6)

23. The evidence of Mr. Bosworth's attitude towards age is not limited to these events that occurred while he was at Top Flite. When he appeared at his deposition in this case, even though he obviously knew that he was appearing as a management representative and decision maker in an age discrimination law suit, he could not restrain himself from discriminatory comments. He referred to the "inside crew" at Top Flite as the "old regime". (Exh. 4, p. 119).

24. He explained at length that Paul Duval was part of the "old regime", that he "concentrated on how things were done in the past", he criticized Mr. Duval "because Paul was telling us what we should do from ten years ago and it had no point of relevance", and he was "just so stuck in the old ways" (Exh. 4, pp. 28-33).

25 In fact, Mr. Duval never expressed these attitudes, it was *Mr. Bosworth's* perception that he was stuck in "old ways" (Exh. 1).

26. At his deposition, Mr. Bosworth also offered his opinion about "experience":

> I made the statement a lot is that a lot of people there who said they had twelve, thirteen, fifteen years experience and, in my opinion, they had one year of experience, they just did it thirteen times or fifteen times in a row (Exh. 4, pp. 26-27)

27. Mr. Bosworth made it clear that the above remarks were directed at "most of the sales management team" and in particular, Paul Duval (Exh. 4, p. 27).

28. He reiterated that Mr. Duval didn't really have more experience in the golf business than the 34 year old Reid Gorman because he just "had more years on the job', but not more "experience" because he was not "exposed to the types of business that the modern golf

equipment manufacturers needed". (Exh. 4, p. 111)

29. Mr. Bosworth also identified Lou Turisi (age 47), his predecessor, as a member of the old regime (Exh. 4, p. 28) and on a visit to Top Flite before his hiring, told Bob Penicka he had no interest in working with "that gentleman", who Mr. Bosworth laughed at to his face, telling him "on a social visit" that he was "still in the past". (Exh. 4, pp. 140-141)

30. Andrew Kelleher, who made the decision to terminate John Bettencourt and Michael Behaylo demonstrated the same attitude as Mr. Bosworth and Mr. Penicka. Mr. Kelleher who was in his thirties and who held the position of Vice President of Finance, told John Bettencourt that long term employees who "are still here all this time" were "deadwood". (Exh. 7, #12) and that the top management of the Company looked at people with a lot of seniority and could not understand why they were still there. (Exh. 8, pp. 107-108)

31. Just like Mr. Bosworth, Andrew Kelleher could not restrain his discriminatory attitudes at his deposition. He too, knowing he was appearing as a management representative in an age discrimination suit, still maintained his prejudiced beliefs. When shown a department organization chart (Exh. 9), he referred to it as the organization he had "inherited" and stated "it is a lot of legacy folks that had been around with Spalding" (Exh.10, pp. 10-11).

32. Mr. Kelleher considered both Mr. Bettencourt and Mr. Behaylo "overqualified" for accounting positions and a few months after their layoffs, he hired recent college students in their 20's as accountants. (Exh. 10, pp. 53-54)

33. Mr. Kelleher told Paul Duval that anything that had happened before 2003 was "meaningless". (Exh. 3, p. 212)

34. The Callaway vision of the desirability of a "young by design" team was also shared by Richard Levandowski, who played a role in the termination of Michael Behaylo and by Thomas Fry who made the decision to terminate Gary Lonczak. Mr. Levandowski was Mr. Bettencourt's successor in the finance department. (Exh. 11, p. 10).

35. When asked about discussions he'd had with Mr. Kelleher, Mr. Levandowski had the following thoughts to offer:

> Q. Did you ever hear him comment on the age of the employees who were there when he arrived or throughout your tenure?
> A. We always talked about the age of the manufacturing group because that seemed to be always one of our problems. ls's an elderly workforce and therefore generates additional costs in higher medical insurance, higher costs of those things.
> Q. Higher cost of what?
> A. Medical costs and that type of cost.

Q. Again, when you say the manufacturing group, that would include who?
A. Basically the hourly people.
Q. These are people involved directly in the manufacture of the balls?
A. Right.
Q. When you say "we" would discuss it, you mean who?
A. Well I would discuss it with Andrew. We would look at the costs. We'd have a lot of absenteeism. If it gets really hot, some of the elder people do not show up as often; it's just the way it is.
It wasn't a statement of degrading anybody, it's just, okay, we have an elderly workforce, we're going to have higher medical benefits, we're going to have higher absenteeism. It just happens.
Q. Had someone examined the absenteeism in relationship to the age of the workers?
A. I believe we had that study done just to get -- over a brief period of time, eight, ten weeks.
Q. When was that done?
A. I couldn't be honest and tell you. I mean, we would look at it at least once a year just to see what was going on. Absenteeism was always a big problem.
Q. When you say "we," now you're talking about who?
A. If it was absenteeism, we would ask Lynn because at the time she also had payroll so we'd let her do the research and give us with statistics.
Q. What was the research you were asking her to do?
A. We'd look and say –
Q. When you say "we" you mean who?
A. Management -- Andrew, myself, Jim Laughlan, we would look at the manufacturing costs, we'd get Tom Fry involved.
We'd say this is a problem, get into the summer months or the high peak periods of production and if you have high absenteeism then you have to work overtime to recover the same amount of hours. It's just additional expense.
Q. You're saying that in particular you had asked Lynn Lafond to do a study on that?
A. We would ask to take a look at the absenteeism, is it running higher than normal, is it the same.
Q. Did she produce such reports?
A. Yes.
Q. Did you ask that it be analyzed in terms of the age of the employees?
A. Well, we kind of knew which departments were more elder than not. We knew where the younger people had been just hired or the younger ones were. We didn't do it by age specific.
Q. How did you conclude that the older workers were more prone to absenteeism?
A. I didn't say the more elder. I said we have an elder workforce so that

       tends to lead to higher than normal absenteeism. If you take a look at a younger workforce - - and it doesn't matter it it's in this business or not - - you go to a younger workforce they have a tendency to not have as much absenteeism.

       (Exh. 11, pp. 43-44 )

36. These comments are revealing in many ways. While defendants may attempt to dismiss them as comments about hourly workers, they clearly reflect, and are consistent with the Company's attitude towards all older workers as demonstrated in other statements by Messers. Penicka, Bosworth and Kelleher. It is notable as well that Mr. Levandowski states that Tom Fry was part of this group which monitored and worried about employee's ages. Mr. Fry was the decision maker in Mr. Lonczak's case.

37. Lastly, the depth to which the Callaway's attitude towards age and experience permeated the Company was also evident when a member of Callaway's personnel department in California visited Chicopee to help employees with the new benefit package. She commented that she had never seen a company with so many employees with over 20 years seniority and that, at Callaway, she was accustomed to people who had been there less than 10 years. (Exh.1)

                            THE DEFENDANT, MICHAEL BEHAYLO
                            BY HIS ATTORNEY

Dated: January 16, 2007         / S / Maurice M. Cahillane
                            Maurice M. Cahillane, Esq.
                            EGAN, FLANAGAN AND COHEN, P.C.
                            67 Market Street - Post Office Box 9035
                            Springfield, MA 01102
                            (413) 737-0260; Fax: (413) 737-0121
                            BBO# 069660

12074-050132\127860.wpd